William B. Stout v. Commissioner.
Stout v. Commissioner
Docket No. 15548.
United States Tax Court
1949 Tax Ct. Memo LEXIS 37; 8 T.C.M. (CCH) 988; T.C.M. (RIA) 49265; November 2, 1949
*37 R. M. O'Hara, Esq., and Harry A. Smith, C.P.A., for the petitioner. R. E. Maiden, Jr., Esq., and E. A. Tonjes, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined a deficiency of $16,039.75 in petitioner's income tax for the fiscal year ended November 30, 1944. Petitioner received $35,000 payable as "royalties" under a contract whereby he caused patents and other assets to be transferred to a corporation which employed him as a research director. He charges error in the Commissioner's determination that the $35,000 is taxable as ordinary income, contending that it was in fact capital gain derived from a sale of patents; respondent argues that it was additional compensation. Petitioner also charges error in respondent's disallowance of a deduction claimed for a bad debt which petitioner's lawyer reported uncollectible. A third assignment of error was abandoned. Findings of Fact Petitioner, at present a resident of Phoenix, Arizona, formerly resided at Pontiac, Michigan, and filed his income tax return for the fiscal year ended November 30, 1944, with the collector of internal revenue for the district *38 of Michigan. This return was prepared on the basis of cash receipts and disbursements. Petitioner, an engineer, for many years has performed and directed research and experimental work in the design and construction of airplanes and motor cars, making inventions on which numerous patents have been issued to him. He has carried on this work individually and also as an officer of Stout Engineering Laboratories, Inc., Stout Skycraft Corporation, Century Motors Corporation and Stout Motor Car Co. (hereafter called Laboratories, Skycraft, Century Motors and Motor Car, respectively), all Michigan corporations operated under his management. He was shareholder in Century Motors and his daughter, Wilma Stout Fisher, owned all the stock of Laboratories. He was the president of Laboratories; his daughter was vice president, and her husband, John F. Fisher, was secretary-treasurer. The three of them constituted its board of directors. John F. Fisher advised petitioner on financial matters; held a general power of attorney to act for him, and sometimes represented him in negotiations and business transactions. On July 27, 1939, petitioner acquired from Motor Car at a cost of $30,786.29 seven *39 patents on devices for automobile construction. Of the seven, four had been originally issued to him. In August 1942 he and Ruben Fleet, acting for Consolidated Aircraft Corporation (later Consolidated-Vultee Aircraft Corporation and hereafter called Consolidated) began a series of conferences which culminated in an agreement for Consolidated's acquisition of these patents pursuant to a plan involving its purchase of other patents, patent applications, assets of Laboratories and Skycraft, the stock of Century Motors, and its employment of petitioner as research director. Consolidated wished the patents for use in the manufacture of a new type of bus fof the Greyhound Bus Co., but in making the contract, was primarily interested in procuring petitioner's services, and petitioner, in his own words, was: "* * * primarily interested in continuing to do the creative work * * * without unnecessary detour on financial, production or sales matters. * * *" In the preliminary negotiations an annual salary of $50,000 for petitioner and a price of $180,000 for the properties were proposed. Petitioner wrote Consolidated's representative that "the business set-up" could: "* * * either be purchased *40 outright with our organization continuing in a research capacity or we can set the whole thing up on a contract basis with option of purchase of all the activities. * * *" Consolidated's tax consultant, who attended the conferences, pointed out that a $50,000 salary would provide an advantageous tax deduction, but that amount was not found acceptable because out of line with salaries paid to other Consolidated officials. Petitioner then offered his services at a dollar a year if Consolidated would pay $300,000 for the properties, but no agreement was reached on that basis. On September 11, 1942, petitioner wrote Consolidated's representative, seeting forth in detail his interest in Laboratories, Skycraft and Century Motors; describing all as formed merely to carry out his research programs, listing the stockholders of each, and suggesting that Consolidated either acquire these firms and the necessary patents for a price of $300,000, or contract with him for a research program "on a cost plus 10% basis" with option to purchase all the firms later. He added: "As far as salary for myself is concerned, that matter can rest entirely in your hands. * * *" At the final conference *41 petitioner made no objection to a proposed salary of $25,000 for himself; Consolidated agreed to pay him $65,000 for properties, including patents; $115,000 termed "royalties" on patents to be transferred to it, and conceded to him 20 per cent of any royalties that it might receive from others from the licensing of patents on his inventions. The terms finally agreed upon were incorporated in a "Memorandum of Agreement" dated September 28, 1942. In this instrument the parties recited that petitioner desired: "* * * to dispose of all personal interest in said patents and to cause the majority interest in the outstanding capital stock of Century Motos Corporation and all of the assets of said Stout Engineering Laboratories, Inc. and Stout Skycraft Corporation * * * [with specified exceptions] to be transferred to Consolidated, and to enter the employment of Consolidated, * * *." The parties then agreed that Consolidated advance to petitioner $50,000, of which he would lend $30,000 to Laboratories to be used by it in acquiring from Senior Investment Corporation certain notes and shares of Skycraft, notes of Laboratories and shares of Century Motors; that petitioner would use the *42 remaining $20,000 to buy Century Motors shares from minority shareholders and would transfer such shares to Laboratories; that after Laboratories should acquire all shares of Skycraft, petitioner would cause Skycraft to be merged into Laboratories, and would then cause Laboratories to transfer to Consolidated all its assets (except cash, receivables and certain patents). The assets to be transferred comprised sixteen patents, of which all but three had been originally issued to petitioner. In respect of the patents owned personally by him, petitioner agreed: "* * * to transfer said patents and any other patents or patent applications owned by him to Consolidate, or to Stout Engineering Laboratories, Inc., and to cause said corporation to transfer said patents or patent applications to Consolidated, * * * reserving unto himself only such interest as he may have in patents or license agreements pertaining to the portable building structures known as 'Stout Houses', trailers and appurtenances thereof which are not covered by this agreement. * * *" Upon execution of proper inst uments of conveyance of these assets, Consolidated agreed to pay petitioner $15,000 and to relieve him of *43 all obligation to repay the $50,000 initially advanced. It also agreed to employ him as engineer in charge of its development and research work for a period of five years at an annual salary of $25,000. Petitioner agreed to devote his entire time and attention to such work and promptly to: "* * * disclose to the officers of the corporation all new inventions and developments worked out by him during the term of said employment, and upon request, sign such patent applications and assignments thereof as may be necessary or required to vest full title to such inventions and developments and any patents obtainable thereon in Consolidated. "It is further agreed that Stout, in addition to his fixed salary at the rate of Twenty-Five Thousand ($25,000) Dollars annually, shall receive royalties on the use of any of his said inventions or developments by Consolidated * * *, or any of its affiliated companies, and that such royalties shall be computed and payable at the rate of two (2) percent, upon actual sales by any of said corporations of products developed by Stout, until an aggregate total of One Hundred Fifteen Thousand ($115,000) Dollars shall be paid, and that after payment of such *44 royalties in the total amount of One Hundred Fifteen Thousand ($115,000) Dollars shall be paid, and that after payment of such royalties in the total amount of One Hundred Fifteen Thousand ($115,000) Dollars no further royalties shall be payable hereunder * * *. Consolidated agrees that the aggregate total of $115,000 royalties payable hereunder will be paid during the five (5) years of this Agreement, and if same are not earned and paid, agrees at the end of said five (5) year term to make up the deficit and pay to Stout any balance of said $115,000 not previously paid. Consolidated also agrees that in the event of the sale of any of such inventions or the licensing of the same to any unaffiliated companies or outside interests, Stout, in addition to the payments hereinbefore mentioned shall receive twenty (20) percent of the net revenue or profit derived by Consolidated from such sale or royalties." After approval of this contract by Consolidated's board of directors petitioner, by an instrument dated November 23, 1942, made a formal assignment to Laboratories of all right, title and interest in the seven patents acquired by him from Motor Car. Laboratories then credited to him *45 on its books $23,351.76, an amount equal to his cost of the patents, as reduced by amortizations, and entered the figure on its books as cost to it. The $23,351.76 was later paid to petitioner, and he reported the transaction on his tax return for the fiscal year 1942, showing neither gain nor loss, but explaining that: "The sale price was indeterminate inasmuch as the ultimate amount to be received may be affected by sale or licensing of such patents by the purchaser. The taxpayer * * * is to receive thereafter royalties at the rate of 2% upon sales of products covered by patents in an amount not to exceed $115,000.00, plus 20% of net revenue or profit derived by the purchaser from the licensing or sale of said patents." On Laboratories' 1942 tax return, signed by petitioner and Fisher as officers, a loss was reported on the sale of all its assets, inclusive of the patents. It indicated $23,351.76 as its basis for the seven patents and $64,581.40 was used as the total sale proceeds. The other transactions contemplated by the agreement were carried out, Skycraft was merged with Laboratories on September 28, 1942. Laboratories assigned to Consolidated the seven patents above mentioned *46 and other patents, and executed a bill of sale, transferring all its property (with the specified exceptions) to Consolidated "for and in consideration of the sum of $65,000", which Consolidated paid to Laboratories, as provided. On a schedule attached to this bill of sale $1 of the $65,000 recited price was attributed to "Patents and patent applications". Laboratories remained in existence as a holding company, and from the patents retained by it derived a royalty income of over $15,000 a month. Consolidated employed petitioner as director of its research division, and like all other employees in that division he signed an agreement to disclose promptly any invention made by him and to perform all acts necessary to Consolidated's procurement of a patent thereon. Consolidated agreed to pay him 20 per cent of any income which it might derive from a sale or licensing of such patent. On April 5, 1944, Consolidated paid to petitioner $35,000 of the $115,000 payable under the contract as "royalties" on the use of his inventions, and in 1946 paid to him the remaining $80,000. Both payments were charged on its books to expense and so deducted on its tax returns. On June 19, 1945, Consolidated *47 by contract agreed to grant Graham-Paige Motors Corporation the use of petitioner's services for a designated period, and for a specified royalty licensed Graham-Paige to use its patents on inventions made by petitioner. On August 20, 1947, Consolidated, Kaiser-Frazer Corporation and petitioner made a contract in which assignment of the prior contract by Graham-Paige to Kaiser-Frazer was recited, and all parties agreed to a termination of the contracts for specified considerations. On the same date Consolidated petitioner made an agreement whereby petitioner released Consolidated from further liability in respect of income derived from patents on his inventions and received from Consolidated a payment of $6,874.99, which amount was 20 per cent of Consolidated's receipts from Kaiser-Frazer on account of its use of the patents acquired from Motor Car. In 1946 Consolidated ceased construction of the Greyhound bus, and sold to petitioner for $10,000 all the patents which it had acquired from Laboratories, reserving, however, a right to the free use of those relating to airplane construction. Under the contract of September 28, 1942, which covered the period October 1, 1942-1947, Consolidated *48 paid a total of $302,522.77, consisting of the $65,000 initially paid for property, the $115,000 payable as "royalties", the $6,874.99 representing 20 per cent of the royalties received from Kaiser-Frazer, and salary payments. aggregating $115,647.78. On his income tax return for the fiscal year 1944 petitioner reported the $35,000 paid to him on April 5, 1944, as proceeds from a sale of patents, treating the full amount as longterm capital gain, explaining that he had: "* * * fully recovered his cost from a sale of capital assets for an indeterminate sales price, * * *." The Commissioner determined that the $35,000 constituted royalties taxable as ordinary income. About 1929 petitioner loaned $2,500 to his nephew, Fred Bushnell, who was engaged in the bulk oil business in Wisconsin. Bushnell gave petitioner five notes for $500 each, and renewed them several times without payment. In 1940 Fisher, acting for petitioner, placed the notes in the hands of his attorney for collection. Bushnell thereafter made some small payments, reducing the indebtedness to $2,325.75 by January 1, 1943. In 1944 the attorney informed Fisher that Bushnell's service station had been burned; that Bushnell *49 was in extreme difficulties; that the notes were not collectible, and that further action would result in a waste of money. Petitioner charged off the debt as worthless at the end of the fiscal year 1944, and deducted the $2,325.75 as a bad debt on his tax return. The debt became worthless in 1944; the resulting loss was not incurred in petitioner's trade or business. The Commissioner disallowed the deduction because "not established". Opinion Petitioner contends that the $35,000 which he received in the fiscal year 1944 as a part of the $115,000 total payable to him as "royalties" represented consideration from sale of the seven patents and is taxable as long-term capital gain. Respondent determined it taxable as ordinary income, and now defends that determination by the argument that the payment was compensation for petitioner's services. In support of his position petitioner stresses that the $115,000 was payable at all events as a fixed sum, and he introduced much evidence concerning circumstances attending the negotiation of the contract for the purpose of establishing that the parties really intended the so-called royalties to be an element in the price of the assets: specifically, *50 of the seven patents. He cites Arthur N. Blum, 11 T.C. 101, and Estate of Johnson N. Camden, 47 B.T.A. 926, as authorities for the proposition that this intent should fix the character of the payment for tax purposes. We have given to petitioner's interpretation of the contract terms, the attendant circumstances of the transaction and the various proposals in the course of negotiations a careful study, but we fail to discover any intent to sell the seven patents for the $115,000. Indeed we can not regard the figure as even related to the seven patents whether it be deemed a royalty, sale consideration or something else. Petitioner agreed that he would disclose and assign to Consolidated "all new inventions and developments worked out by him during the term of said employment" by Consolidated, and in the paragraph immediately following it was agreed that he "shall receive royalties on the use of any of his said inventions or developments" (italics supplied) at the rate of 2 per cent of sales until a total of $115,000 should be paid "in addition to his fixed salary at the rate of Twenty-Five Thousand ($25,000) Dollars annually". This language, in our opinion, *51 relates the $115,000 to patents on inventions developed during the course of the employment, not to those transferred at the time of the contract. It is true that the record fails to disclose any patents resulting from petitioner's employment and that he was paid $6,874.99, representing 20 per cent of Consolidated's receipts from Kaiser-Frazer for use of the seven patents in controversy. But this payment, which was in addition to the $115,000, was required by separate contract, and hence does not support any inference that the parties themselves regarded the $115,000 in any way applicable to the patents acquired by Consolidated in September 1942. But even if the language of the argument were so loosely construed as to permit such an inference, we could not accept petitioner's view for the reason that he did not sell the seven patents to Consolidated. He could have done so under the agreement's terms, as he points out. But he chose the optional alternative of selling the patents to Laboratories and he received from Laboratories the price of $23,351.76. This sale was formally completed; the price was paid, and on his 1942 tax return petitioner reported the transaction. Consolidated *52 acquired the patents, together with other assets, by purchase from Laboratories, which properly reported the transaction as its sale on its 1942 return. Petitioner suggests that Laboratories served merely as a conduit through which he passed patent titles to Consolidated, and he cites Paymer v. Commissioner (C.C.A., 2nd Cir.), 150 Fed. (2d) 334, and 112West 59th Street Corporation v. Helvering (D.C. App.), 68 Fed. (2d) 397, as comparable instances in which a corporation has been ignored for tax purposes as "a passive dummy" through which its shareholder sold assets. These holdings are not here pertinent. Laboratories was not an inactive corporation and petitioner held no shares in it. It survived the transactions in controversy with substantial assets and substantial income. Whatever tax incidence might have resulted if petitioner himself had sold the seven patents to Consolidated is a moot question. We are here concerned with what was done, and as Laboratories was a fully recognizable corporate entity in which petitioner owned no stock, its sale of the patents to Consolidated is fully recognizable, and Consolidated's payments of "royalties" to petitioner *53 can not be deemed in effect consideration for patents which Consolidated bought from another. It is, however, equally true that no part of the $115,000 can properly be described as "royalties" in the absence of evidence that Consolidated made sales of products manufactured by use of inventions which petitioner developed during the course of his employment. But as the $115,000 was payable to petitioner "in addition to his fixed salary", we are persuaded that the $35,000 of it here in issue should be regarded as additional compensation and so taxed. Petitioner rendered services to Consolidated, but he transferred no assets; in the preliminary negotiations a $50,000 salary was proposed. This background lends color to an inference that the "royalties" were really intended as compensation but were not so called in order to avoid a comparison with the salaries which Consolidated paid to other officers. The Commissioner's determination that the $35,000 should be taxed as ordinary income is sustained. Petitioner deducted $2,325.75 as a bad debt, represented by uncollectible notes of Fred Bushnell, his nephew, to whom he loaned $2,500 in 1929. The Commissioner disallowed the deduction as *54 "not established", and defends the determination by the argument that petitioner has failed to show that the debt did not become worthless in a prior year. The question is one of fact. From the evidence it appears that in 1940 the notes were placed for collection with a lawyer; that some small payments were thereafter made by Bushnell, and that the lawyer notified Fisher in 1944 of Bushnell's financial difficulties after the burning of his service station and advised that any further efforts to collect would be a waste of money. The notes were obviously not worthless while small payments were being made on them and more could be expected. Bushnell's misfortune, however, could reasonably have changed the prospects, and in accepting the lawyer's conclusion that no further collections could be made, petitioner in our opinion was warranted in charging off and deducting the unpaid balance as a bad debt become worthless in that year. Cf. Rosenthal v. Helvering (C.C.A., 2nd Cir.), 124 Fed. (2d) 474; Patten & Davies Lumber Co. v. Commissioner (C.C.A., 9th Cir.), 45 Fed. (2d) 556; Richard Downing, 43 B.T.A. 1147. But as the debt was of a non-business *55 character, the amount deductible is subject to the limitations prescribed by section 23 (k) (4), Internal Revenue Code. Decision will be entered under Rule 50.